## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LORI HAINES, | No. 4:24-CV-00536 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| JESSE BROWN, and WOLVERINE TRUCKING INC., | |
| Defendants. | |

### MEMORANDUM OPINION

### JULY 17, 2026

## I.   BACKGROUND

Plaintiff Lori Haines commenced this diversity action against Defendants Jesse Brown and Wolverine Trucking, Inc. ("Wolverine"), asserting claims arising from a motor vehicle collision that occurred in May of 2023, in Wyalusing, Pennsylvania.[1] Plaintiff alleges that Brown negligently and recklessly operated a commercial tractor-trailer owned by Wolverine when he failed to stop for traffic in a marked construction zone, causing a multi-vehicle collision in which Plaintiff sustained personal injuries.[2] Plaintiff further asserts claims against Wolverine for negligent entrustment, negligent hiring, supervision, and retention, as well as

---

[1]   *See* Doc. 26.
[2]   *See* Doc. 28 ¶18.

vicarious liability for Brown's conduct.[3] Plaintiff seeks compensatory and punitive damages.[4]

Following the completion of discovery, Defendants moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56, requesting dismissal of Plaintiff's punitive damages claims.[5] Defendants contend that, even accepting Plaintiff's evidence as true, the record establishes no more than ordinary negligence and therefore cannot support punitive damages under Pennsylvania law.[6] Plaintiff opposes the motion, arguing that disputed facts concerning both Brown's conduct immediately preceding the collision and Wolverine's corporate safety practices present classic jury questions regarding reckless indifference.[7]

The motion has been fully briefed and is ripe for disposition. For the reasons stated below, it is denied.

## II.   DISCUSSION

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] Material facts are those "that

---

[3]   *See* Doc. 28.
[4]   *See id.*
[5]   *See* Doc. 22.
[6]   *See* Doc. 23.
[7]   *See* Doc. 26.
[8]   FED. R. CIV. P. 56(a).

Case 4:24-cv-00536-MWB   Document 29   Filed 07/17/26   Page 3 of 19

could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[9] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[10] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[11] "Further, in ruling on a summary judgment motion a court may, in appropriate cases, render partial summary judgment pursuant to Rule 56(d) of the Federal Rules of Civil Procedure."[12]

Party testimony is sufficient to raise a genuine dispute of material fact on an issue: "'a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment.'"[13] "This is true even where, as here, the information is self-serving."[14] However, courts are not required to credit conclusory testimony, that is, evidence failing to set forth specific factual assertions and instead regurgitating opinions and

---

[9]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[10]  *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).
[11]  *Id.*
[12]  *Kramer v. Newman*, 840 F. Supp. 325, 327 (E.D. Pa. 1993).
[13]  *Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018) (quoting *Lupyan v. Corinthian Colleges, Inc.*, 761 F.3d 314, 320 (3d Cir. 2014)).
[14]  *Id.*

3

conclusions.[15] "[C]onclusory testimonial evidence cannot defeat summary judgment."[16]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[17] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[18] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[19] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[20]

### B.     Undisputed Facts

With that standard outlining the framework for review, the Court now turns to the undisputed facts, resolving doubts in favor of the Plaintiff, the non-moving party.

As I noted above, this action arises from a motor vehicle collision that occurred on May 22, 2023, at approximately 11:22 a.m., on State Route 6 near the

---

[15]   *Daimler v. Moehle*, No. 23-2611, 2025 WL 1355138, at *5 (3d Cir. May 9, 2025).
[16]   *Id.*; *see also Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012).
[17]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[18]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).
[19]   FED. R. CIV. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).
[20]   FED. R. CIV. P. 56(c)(3).

intersection of Tamarack Road in Wyalusing, Pennsylvania.[21] At the time of the collision, State Route 6 was an active PennDOT construction zone.[22] Advance warning signs had been placed to notify approaching motorists of the work zone.[23]

Haines was operating her 2004 Jeep Wrangler eastbound on State Route 6.[24] Plaintiff observed construction warning signs before reaching the work zone.[25] Plaintiff also observed a flagger directing traffic through the construction area.[26] Plaintiff slowed her vehicle and came to a complete stop behind other traffic because of the construction activity.[27]

Brown was operating a 2019 Mack Anthem tractor-trailer owned by Defendant Wolverine Trucking, Inc. at the time of the collision.[28] Brown was acting within the course and scope of his employment with Wolverine Trucking;[29] he testified that the tractor-trailer weighed approximately 79,000 pounds.[30]

Brown further testified that he did not observe the construction warning signs before approaching the stopped traffic, which was just over the crest of a hill.[31] Due to oncoming traffic in the left lane, however, Brown also testified that he attempted

---

[21]   Doc. 1 ¶¶ 10-19.
[22]   *Id.* ¶ 11.
[23]   *Id.* ¶ 12.
[24]   Doc. 28-2 at 36:1-39:12.
[25]   *Id.* at 36:1-37:24
[26]   *Id.*
[27]   *Id.* at 38:1-39:12.
[28]   Doc. 1 ¶¶ 6, 14.
[29]   *Id.* ¶ 6.
[30]   Doc. 28-3 at 54:3-12.
[31]   *Id.* at 95:20-96:10.

to avoid the collision by steering left after recognizing the stopped traffic.[32] Brown nevertheless collided with Plaintiff's vehicle after swerving back into the right lane.[33]

Plaintiff testified that Brown's tractor-trailer violently struck her stopped vehicle,[34] and further testified that Brown's tractor-trailer continued forward after striking her vehicle and collided with additional stopped vehicles.[35] Brown testified that he was not speeding immediately before the collision.[36] Plaintiff, however, relies on Brown's testimony that he was traveling approximately forty-five to fifty miles per hour into stopped traffic immediately before impact.[37]

Brown testified that the construction workers were responsible for his inability to recognize the construction zone and safely stop his vehicle, as they failed to place sufficient signage to war of stopped vehicles ahead.[38] Plaintiff, by contrast, testified that she and every vehicle ahead of Brown recognized the construction zone, observed the warning signs, and safely stopped their respective vehicles before the collision.[39]

---

[32]  *Id.* at 95:20-105:16.
[33]  *Id.*
[34]  Doc. 28-2 at 38:1-39:12.
[35]  *Id.*
[36]  Doc. 28-3 at 101:17-102:14.
[37]  *Id.*
[38]  *Id.* at 74:1-83:16.
[39]  Doc. 28-2 at 36:1-39:12.

Brown obtained his commercial driver's license (CDL) after attending Greater Southern Tier BOCES.[40] Brown subsequently worked as a commercial driver for Coca-Cola.[41] Wolverine hired Brown on May 27, 2020,[42] and Brown received ride-along training when he joined Wolverine.[43] Approximately two months after joining Wolverine, Brown was involved in a commercial vehicle accident in which he struck a bridge.[44] Plaintiff relies on evidence that Brown received neither retraining nor discipline following that accident, nor did Wolverine provide any formal post-accident training.[45]

Plaintiff further relies on evidence that Wolverine reviewed an incomplete employment history before hiring Brown.[46] Plaintiff also relies on testimony that Wolverine did not provide drivers with specific safe-driving training.[47] Plaintiff additionally relies on testimony that Wolverine did not provide formal post-accident training, and relies on testimony that Wolverine maintained neither a safety committee nor a safety consultant.[48] Plaintiff further relies on testimony that

---

[40]  Doc. 24-3 at 19:3-21.
[41]  *Id.* at 28:16, 33:23.
[42]  Doc. 28-4 at 47-50.
[43]  Doc. 28-5 at 15:1-21; Doc. 24-3 at 41:24-45:12.
[44]  Doc. 28-4 at 49:1-50:8.
[45]  Doc. 28-4 at 38; 49:1-50:8.
[46]  Doc. 28-6, Matthews Report (the Matthews Report was prepared by Plaintiff's trucking safety expert, Ted Matthews. Matthews relies on the rule as set forth in 49 C.F.R § 391.23 which requires carriers to contact previous employers in order to obtain and evaluate a driver's past experience and performance. Matthews asserts that Brown's previous employers did not submit the requisite forms outlining Brown's history to Wolverine).
[47]  Doc. 28-4 at 32-33; 40.
[48]  *Id.* at 38; 40.

Wolverine had no standard operating procedure governing the download of post-accident telematics despite possessing the technology to do so.[49]

John Agar, Wolverine's Product Fulfillment Manager at the time of his deposition, testified that drivers should begin slowing after encountering construction warning signs.[50] Agar testified that drivers should "slow it down" after observing a "One Lane Road Ahead" sign.[51] Agar further testified that drivers should be "going very slow" after observing a "Flagger Ahead" sign.[52] He also agreed that speeding in a construction zone is more dangerous than speeding on an ordinary roadway.[53]

Defendants rely on evidence that, following the incident, Brown underwent the post-accident drug and alcohol testing required by the Federal Motor Carrier Safety Regulations.[54] They further note that Brown's post-accident drug and alcohol test returned negative results.[55] Furthermore, Jack Van Steenburg, Defendants' trucking safety and Federal Motor Carrier Safety Act ("FMCSA") expert, opined

---

[49]   *Id.* at 16:9-17.
[50]   Doc. 28-5 at 22:1-25:8.
[51]   *Id.* at 24:11-16.
[52]   *Id.* at 24:17-23.
[53]   *Id.* at 25:1-8.
[54]   Doc. 24-5 (this Court notes, however, that testing that occurred after the accident is largely irrelevant to the issue at hand, which is whether Brown and Wolverine acted beyond mere negligence in causing the accident. Anything that occurred post-accident does not speak to Defendants' conduct leading up to the accident. One may act with extreme care following an event while also having engaged in activity that he knew or should have known would cause an unreasonable risk to others prior to and in causing the event).
[55]   Doc. 24-5; Doc. 28-5 at 26:1-9.

that Wolverine complied with the Federal Motor Carrier Safety Regulations governing interstate motor carriers.[56] Van Steenburg further opined that Wolverine maintained systems governing drug and alcohol testing, cell-phone use, vehicle maintenance, and driver discipline.[57] Finally, Van Steenburg opined that Applicant Insight, a third-party employment screening and background investigation company, investigated Brown's qualifications before his hiring and concluded that Brown satisfied the Federal Motor Carrier Safety Regulations applicable to commercial drivers.[58]

### C.   Analysis

Defendants move for summary judgment solely with respect to Plaintiff's claims for punitive damages.[59] Defendants argue that, even viewing the evidence in the light most favorable to Plaintiff, the record establishes no more than ordinary negligence and is therefore insufficient to support punitive damages under Pennsylvania law.[60] Plaintiff responds that genuine disputes of material fact exist regarding both Brown's operation of the tractor-trailer and Wolverine's hiring, training, supervision, and safety practices.[61] After what it considers a thorough review of the record, the Court agrees with Plaintiff.

---

[56]   Doc. 24-6 at 6.
[57]   *Id.*
[58]   *Id.* at 6-7.
[59]   Doc. 22.
[60]   Doc. 23 at 5-16.
[61]   Doc. 26 at 4-17.

### 1.      Pennsylvania Law Governing Punitive Damages

Under Pennsylvania law, punitive damages are an "extreme remedy" available only in exceptional cases.[62] Their purpose is not to compensate an injured plaintiff but to punish outrageous conduct and deter similar conduct in the future.[63]

Punitive damages may be awarded only where a defendant's "conduct is outrageous, because of the defendant's evil motive or . . . reckless indifference to the rights of others."[64] Mere negligence, or even gross negligence, is insufficient; rather, the plaintiff must "establish that (1) the defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act . . . in conscious disregard of that risk."[65]

Although the issue of punitive damages frequently presents a question for the jury, summary judgment is appropriate where the record contains no evidence from which a reasonable jury could conclude that the defendant acted with the requisite state of mind.[66] Conversely, where competing evidence permits differing reasonable

---

[62]   *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).
[63]   *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991).
[64]   *Feld v. Merriam*, 485 A.2d 742, 747-48 (Pa. 1984).
[65]   *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).
[66]   *See id.* (to determine requisite state of mind, Pennsylvania has adopted the Restatement (Second) of Torts § 500 which states "[T]he actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.").

inferences regarding a defendant's appreciation of the risk and conscious disregard thereof, the issue must be resolved by the jury.[67]

### 2. Defendant Brown

Defendants characterize this matter as a routine rear-end collision resulting from momentary inattention.[68] Plaintiff, however, contends that Brown ignored multiple construction-zone warnings while operating a fully loaded commercial tractor-trailer and thereby consciously disregarded an obvious risk of serious harm.[69] The record contains sufficient evidence to permit a reasonable jury to accept Plaintiff's characterization.

It is undisputed that the collision occurred within an active construction zone.[70] Plaintiff testified that she observed multiple construction warning signs and a flagger before bringing her vehicle to a complete stop behind other traffic.[71] Brown, by contrast, testified that he did not observe the construction warning signs before approaching the stopped traffic.[72] Brown further testified that he attempted to steer left after recognizing the stopped traffic but nevertheless struck Plaintiff's vehicle.[73]

---

[67] *See Brand Mktg. Grp., LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 360 (3d Cir. 2015).
[68] Doc. 23 at 6-8.
[69] Doc. 26 at 4-8.
[70] Doc. 1 ¶¶ 11-13.
[71] Doc. 28-2 at 36:1-39:12.
[72] Doc. 24-3 at 95:20-105:16.
[73] *Id.*

Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Brown failed to perceive not merely a single warning sign but an entire sequence of construction-zone warnings and traffic-control devices. Plaintiff testified that she safely recognized the construction zone and complied with the flagger's instructions;[74] she further testified that the vehicles ahead of her likewise recognized the construction zone and stopped without incident.[75] Brown, on the other hand, testified that he failed to recognize the construction zone before encountering stopped traffic.[76]

The record likewise contains evidence regarding Brown's speed and the operation of his commercial vehicle immediately before impact. Brown testified that his tractor-trailer weighed approximately 79,000 pounds.[77] He further testified that he was traveling approximately forty-five to fifty miles per hour immediately before the collision.[78] Although Brown denied that he was speeding,[79] Plaintiff argues that a reasonable jury could nevertheless conclude that Brown was traveling at an unreasonable speed given the existence of both an active construction zone and stopped traffic.[80]

---

[74]  Doc. 28-2 at 36:1-39:12.
[75]  *Id.*
[76]  Doc. 24-3 at 95:20-105:16.
[77]  *Id.* at 54:3-12.
[78]  *Id.* at 101:17-102:14.
[79]  *Id.*
[80]  Doc. 26 at 5-8.

Plaintiff also relies upon Brown's testimony that he blamed the construction workers because, in Brown's view, the work zone was inadequately marked.[81] Plaintiff, however, observed the construction warning signs, recognized the flagger, and safely stopped before the collision occurred.[82] Plaintiff further testified that Brown's tractor-trailer continued forward after striking her vehicle and collided with additional vehicles before coming to rest.[83]

Moreover, John Agar, Wolverine's Product Fulfillment Manager, testified concerning the operation of commercial vehicles in construction zones.[84] Agar stated that drivers encountering a "One Lane Road Ahead" sign should "slow it down."[85] He further testified that drivers should be "going very slow" after encountering a "Flagger Ahead" sign;[86] he also agreed that speeding in a construction zone presents greater danger than speeding under ordinary roadway conditions.[87]

Defendants emphasize that Brown testified he was not speeding and that he attempted to avoid the collision after recognizing the stopped traffic.[88] They

---

[81]    Doc. 24-3 at 74:1-83:16.
[82]    Doc. 28-2 at 36:1-39:12.
[83]    *Id.*
[84]    Doc. 28-5 at 24:11-25:8.
[85]    *Id.* at 24:11-16.
[86]    *Id.* at 24:17-23.
[87]    *Id.* at 25:1-8.
[88]    Doc. 24-3 at 95:20-105:16; 101:17-102:14.

13

therefore contend that Brown's conduct amounts to no more than ordinary negligence.[89] The Court cannot accept that argument at the summary judgment stage.

A reasonable jury could conclude that Brown merely failed to perceive the construction zone in time to stop safely. A reasonable jury could likewise conclude that Brown consciously disregarded an obvious risk by operating a fully loaded commercial tractor-trailer through an active construction zone without timely recognizing multiple warning signs and stopped traffic. Because the competing evidence supports differing reasonable inferences regarding Brown's state of mind, summary judgment is inappropriate.

### 3.    Defendant Wolverine Trucking

The Court likewise concludes that genuine disputes of material fact preclude summary judgment on Plaintiff's punitive damages claim against Wolverine.

Defendants principally rely on the opinions of their trucking safety expert, Jack Van Steenburg. Van Steenburg opines that Wolverine complied with the Federal Motor Carrier Safety Regulations applicable to interstate motor carriers.[90] He further opines that Wolverine maintained systems governing drug and alcohol testing, vehicle maintenance, cell-phone use, and driver discipline.[91] He also asserts that Wolverine retained Applicant Insight, a third-party background screening

---

[89]    Doc. 23 at 6-8.
[90]    Doc. 24-6 at 6.
[91]    *Id.*

company, to investigate Brown's qualifications before hiring him and that Brown satisfied the Federal Motor Carrier Safety Regulations applicable to commercial drivers.[92] Finally, Van Steenburg opines that Wolverine was not required to administer its own road test because Brown already possessed a valid commercial driver's license.[93]

Plaintiff, however, relies upon contrary evidence from both fact witnesses and Plaintiff's trucking safety expert, Ted Matthews.[94] Matthews opines that Wolverine failed to maintain a complete driver qualification file for Brown before hiring him,[95] and that Brown's employment application omitted portions of his prior employment history and contained an unexplained employment gap.[96] Matthews also opines that Wolverine failed to adequately determine whether Brown could safely operate the commercial vehicle involved in this collision.[97] He further concludes that Brown's lack of training and experience contributed directly to the collision.[98]

Moreover, Wolverine's corporate representatives testified that Brown received only ride-along training when he joined Wolverine.[99] Eric Strang, a Wolverine employee who was deposed as a corporate representative, testified that

---

[92]   *Id.* at 6-7.
[93]   *Id.* at 7.
[94]   *See* Doc. 28-6.
[95]   *Id.* at 6.
[96]   *Id.*
[97]   *Id.*
[98]   *Id.*
[99]   Doc. 24-3 at 41:24-45:12; Doc. 28-5 at 15:1-21.

Wolverine did not provide drivers with specific safe-driving instruction beyond orientation.[100] Strang further testified that Wolverine did not provide formal post-accident driver training,[101] and maintained neither a safety committee nor a safety consultant.[102] Finally, he testified that Wolverine had no standard operating procedure governing the download of post-accident telematics despite possessing that capability.[103]

The record also reflects that Brown was involved in another commercial vehicle accident approximately two months after joining Wolverine.[104] Plaintiff relies upon evidence that Brown received neither discipline nor remedial training following that accident.[105] Defendants dispute Plaintiff's characterization of Wolverine's safety practices, and rely upon evidence that Brown underwent the post-accident drug and alcohol testing required by the Federal Motor Carrier Safety Regulations.[106] Defendants further rely upon evidence that Brown's post-accident drug and alcohol test returned negative results.[107]

When viewed collectively, the record presents competing evidence regarding Wolverine's appreciation of known safety risks and the adequacy of its hiring,

---

[100]  Doc. 28-4 at 32-33.
[101]  *Id.* at 38.
[102]  *Id.* at 40.
[103]  *Id.* at 49:1-50:8.
[104]  *Id.*
[105]  *Id.*
[106]  Doc. 24-5.
[107]  Doc. 24-5; Doc. 28-5 at 26:1-9.

training, supervision, and post-accident practices. Resolving those competing factual inferences would require the Court to weigh the credibility of witnesses and competing expert opinions. These are tasks that are reserved for the jury and therefore summary judgment is inappropriate.[108]

### 4.    Remaining Arguments

Defendants further argue that Plaintiff's negligent hiring, supervision, and retention evidence merely repackages ordinary negligence and therefore cannot support punitive damages.[109] Plaintiff responds that Wolverine's hiring, training, supervision, and post-accident practices demonstrate a conscious disregard for known risks associated with commercial trucking operations.[110]

At this stage of the proceedings, the Court need not determine which interpretation of the evidence is ultimately correct.[111] Plaintiff has produced evidence from which a reasonable jury could conclude that Wolverine appreciated the dangers associated with commercial trucking operations yet nevertheless failed to adequately train, supervise, or remediate Brown following an earlier accident.[112]

---

[108]  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding that a district court may not make credibility determinations when deciding a motion for summary judgement).

[109]  Doc. 23 at 11-16.

[110]  Doc. 26 at 8-17.

[111]  *See Anderson*, 477 U.S. at 255.

[112]  Doc. 28-4 at 32-40, 49:1-50:8; Doc. 28-6 at 6-7.

Whether that evidence ultimately establishes reckless indifference is a question for the jury.[113]

Accordingly, viewing the record in the light most favorable to Plaintiff, the Court concludes that genuine disputes of material fact preclude summary judgment on Plaintiff's claims for punitive damages against both Defendants.

## III.   CONCLUSION

Summary judgment serves an important gatekeeping function by eliminating claims unsupported by the evidentiary record. It does not, however, authorize the Court to resolve credibility disputes or choose between competing factual inferences.

Here, Plaintiff has produced evidence that Brown entered a marked construction zone while operating a heavily loaded commercial tractor-trailer, allegedly failed to observe multiple construction warnings, continued at a speed a jury could deem unreasonable under the circumstances, and collided with stopped traffic. Plaintiff has further presented evidence that Wolverine maintained inadequate safety practices, failed to provide meaningful driver training or post-accident remediation, and retained Brown despite an earlier collision and without corrective action.

---

[113] *See Anderson*, 477 U.S. at 255.

Whether that evidence ultimately persuades a jury that Defendants acted with reckless indifference remains to be seen. At the summary judgment stage, however, the Court concludes only that Plaintiff has presented sufficient evidence from which a reasonable jury could reach that conclusion. Accordingly, Defendants' Motion for Partial Summary Judgment will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge